STUART, Justice.
Kurtrina Smith and Rickey Levins separately initiated actions against the African Methodist Episcopal Church, Inc. (“the AME Church”); James L. Davis, bishop and presiding officer of the AME Church’s Ninth Episcopal District (Davis and the AME Church are hereinafter referred to collectively as “the Ninth District”);[1] and *819 Lincoln National Life Insurance Company (“Lincoln National”) (hereinafter collectively referred to as “the defendants”), after Lincoln National denied their respective claims for benefits under certificates of insurance issued pursuant to a group life-insurance policy Davis had purchased from Lincoln National on behalf of the Ninth Episcopal District (“the group policy”), which certificates, Smith and Levins allege, provided coverage for Smith’s mother and Levins’s father. The defendants thereafter moved .the trial court hearing each action to compel arbitration pursuant to arbitration provisions they alleged were part of the group policy and the certificates of insurance issued pursuant to the group policy; however, the trial courts denied those motions, and the defendants appeal. We reverse and remand.
I.
In March 2012, the AME Church’s Ninth Episcopal District held a conference for pastors at which a presentation was made describing a life-insurance program being offered by the Ninth Episcopal District.[2] The ministers returned to their congregations and informed the members of those congregations of the program and the potential for them to obtain life-insurance coverage under it. Under the general terms of the program, certain members and employees of congregations in the Ninth Episcopal District could purchase life-insurance coverage and, upon the insured’s death, benefits would be shared among the insured’s designated beneficiary, his or her home congregation, and various charitable endeavors associated with the Ninth Episcopal District. After becoming aware of the program, Smith’s family purchased coverage for her mother, Myrtle Smith, a member of St. John’s African Methodist Episcopal Church in Montgomery; Levins’s family similarly purchased coverage for Levins’s father, Lawrence Levins, a member of Allen Temple African Methodist Episcopal Church in Bessemer. Smith and Levins were the respective designated beneficiaries of those policies.
■ Both Smith’s mother and Levins’s father died in 2013; however, when Smith and Levins thereafter sought benefits under the certificates issued pursuant to the group policy, Lincoln National denied their claims, stating that, for different reasons, coverage had not been effective for the deceased on the date of his or her death. On May 23, 2014, Levins sued the defendants in the Jefferson Circuit Court, asserting various claims stemming from the marketing and sale of coverage under the group policy and from Lincoln National’s denial of his claim for benefits; on January 30, 2015, Smith filed a similar action in the Montgomery Circuit Court. Eventually, the ‘defendants moved the trial court hearing each- action to compel arbitration pursuant to the following arbitration provision they alleged was part of the group policy:
“The following provisions will apply after the procedures for claim appeals, complaints or any other grievances have been exhausted. In the event of any dispute, claim question or disagreement arising out of or relating to this policy, the parties will use them best efforts to settle such disputes. To this effect, they shall negotiate with each other in good faith to reach a proper resolution.
“Binding arbitration. Any controversy, dispute or claim by any policyholder, insured or beneficiary, or their respective assigns (each referred to herein as *820 ‘claimant’), arising out of or relating in any way to this policy and/or a certificate issued under this policy or the solicitation or sale thereof shall be submitted to binding arbitration pursuant to the provisions of the Federal Arbitration Act, 9 U.S.C. Section 1, et seq. Such arbitration shall be governed by the rules and provisions of the dispute resolution program for insurance claims of the American Arbitration Association (‘AAA’). The arbitration panel shall consist of three (3) arbitrators: one (1) selected by the company, one (1) selected by the claimant and one (1) selected by the arbitrators previously selected.
“It is understood and agreed:
“(1) that the arbitration shall be binding upon the parties;
“(2) that the parties are waiving their right to seek remedies in court, including the right to jury trial; and
“(3) that an arbitration award may not be set aside in later litigation, except upon the limited circumstances set forth in the Federal Arbitration Act.
“The cost of all arbitration proceedings shall be borne by the company, with the exception of the cost of representation of the claimant. Should the arbitrator find that the dispute is without substantial justification, the arbitrator shall have the authority to order that the cost of the arbitration proceedings be borne by the claimant. All arbitration proceedings shall be conducted in the county of residence of the claimant, unless another location is mutually agreed upon by both parties. Arbitration proceedings shall commence within 90 days after the first notification of one party by the other as to their election to arbitrate a dispute regarding this policy.
“Judgment upon the award rendered by arbitrator(s) may be entered in any court having jurisdiction thereof.
“Arbitration under this provision is confidential. Neither a party nor an arbitrator may disclose the existence, content or results of any arbitration hereunder without the prior written consent of both parties.”
This arbitration provision was labeled as an amendment to the group policy and was printed on a form labeled “GL-AMEND.ARBITR” that was attached to the policy, numbered sequentially, and stated on its face that it took effect on “the date this policy takes effect.” The defendants further assert that the certificate of group life insurance prepared for each insured contained a separate notice explaining that the group policy obtained by the AME church included a binding arbitration agreement; this notice was printed on a form titled “AL ARB NOTICE-CERT.”
Smith and Levins opposed the motions to compel arbitration filed in each of their cases, and the parties thereafter conducted extensive briefing on the issue. On June 5, 2015, the Montgomery Circuit Court denied the motion to compel arbitration in the Smith action, and, on July 14, 2015, the Jefferson Circuit Court did the same in the Levins action. The Ninth District and Lincoln National thereafter separately filed timely appeals to this Court challenging the denial of their motions to compel arbitration in both the Smith action and the Levins action. Because the facts underlying the actions are similar and because the issues raised and arguments presented in the appeals largely overlap, we have consolidated the four appeals for the purpose of waiting one opinion.
II.
The standard of review we apply to a ruling denying a motion to compel arbitration is well settled:
*821 This Court reviews de novo the denial of a motion to compel arbitration. Parkway Dodge, Inc. v. Yarbrough, 779 So.2d 1205 (Ala.2000). A motion to compel arbitration is analogous to a motion for a summary judgment. TranSouth Fin. Corp. v. Bell, 789 So.2d 1110, 1114 (Ala.1999). The party seeking to compel arbitration has the burden of proving the existence of a contract calling for arbitration and proving that the contract evidences a transaction affecting interstate commerce. Id. “[A]fter a motion to compel arbitration has been made and supported, the burden is on the non-movant to present evidence that the supposed arbitration agreement is not valid or does not apply to the dispute in question.” Jim Burke Automotive, Inc. v. Beavers, 674 So.2d 1260, 1265 n. 1 (Ala. 1995) (opinion on application for rehearing).’ ”
Elizabeth Homes, L.L.C. v. Gantt, 882 So.2d 313, 315 (Ala.2003) (quoting Fleetwood Enters., Inc. v. Bruno, 784 So.2d 277, 280 (Ala.2000)). The defendants met their initial burden in this case by submitting to the respective trial courts a copy of the group policy, including the amendment containing the arbitration provision quoted above, and an affidavit from a Lincoln National representative describing the interstate elements of its transaction with the Ninth Episcopal District. Smith and Levins do not dispute that the underlying transaction between Lincoln National and the Ninth Episcopal District affected interstate commerce; however, both at the trial court level and before this Court they have put forth various reasons why the identified arbitration provision should be declared wholly invalid or, at least, inapplicable to their disputes. We consider these arguments de novo.
[[Image here]]
Smith and Levins first argue that the arbitration provision in the group policy is invalid because, they allege, the form on which it is printed was not approved by the Alabama Department of Insurance (“the ADOI”).[3] Section 27-14~8(a), Ala. Code 1975, provides, in pertinent part, that “[n]o basic insurance policy ... or contract, or printed rider, or endorsement form or form of renewal certificate shall be delivered or issued for delivery in this state unless the form has been filed with, and approved by, the commissioner [of the ADOI],” and, in Aetna Insurance Co. v. Word, 611 So.2d 266, 267-69 (Ala.1992), this Court, in reliance on § 27-14-8, Ala. Code 1975, affirmed the trial court’s judgment based on its holding that the use of an unapproved endorsement form rendered that endorsement void. In response to the defendants’ motions to compel arbitration, Smith and Levins submitted to the trial courts hearing their respective actions an affidavit from Craig Devitt, an ADOI employee; that affidavit stated, in relevant part:
“I was provided a copy of what appears to be Lincoln National Life Insurance Company form GL-AMEND.AR-BITR for [the group policy].... After a review of [ADOI] records from the year 2004 to the date of this affidavit, I cannot locate a record showing that GL-AMEND.ARBITR was filed by Lincoln National Life Insurance Company and was accepted or approved by the [commissioner of the ADOI] pursuant to his statutory authority under § 27-14-8.
“I was provided a copy of what appears to be Lincoln National Life Insurance Company form AL ARB NOTICE-CERT for [the group policy].... After a *822 review of [ADOI] records from the year 2004 to the date of this affidavit, I cannot locate a record showing that AL ARB NOTICE-CERT was filed by Lincoln National Life Insurance Company and was accepted or approved by the [commissioner of the ADOI] pursuant to his statutory authority under § 27-14-8.”
Accordingly, Smith and Levins argued to the trial courts hearing their actions, consistent with this Court’s interpretation of § 27-14-8 in Word, that the arbitration provisions in the group policy and in the individual certificates of insurance were unenforceable because they had not been approved by the commissioner of the ADOI.
However, after Smith and Levins filed their respective responses making this argument, the defendants submitted additional evidence establishing that both forms GL-AMEND.ARBITR and AL ARB NOTICE-CERT had been submitted to the ADOI in March 2000 by Guarantee Life Insurance Company and had been approved at that time and that Guarantee Life had subsequently merged with Jefferson Pilot Financial Insurance Company, which had, in turn, merged with Lincoln National. The defendants procured their own affidavit from Devitt in which he explicitly declared that the relevant forms had been “transferred from Guarantee to Jefferson Pilot” in September 2000 and then “transferred from Jefferson Pilot to Lincoln National” in April 2007.
Smith and Levins nevertheless argue that approval of Guarantee Life’s policy forms is not approval of Lincoln National’s policy forms, even if those forms are identical. However, they cite no authority in support of this argument, and we find no support for it in the language of § 27-14-8 or in caselaw considering that statute. Section 27-14-8 provides that no insurance form shall be issued in this State without the approval of the commissioner of the ADOI; however, the language of the statute indicates that it is the form itself that is approved, not a specific company’s use of that form. Indeed, in Waikar v. Royal Insurance Co. of America, Inc., 765 So.2d 11, 16 (Ala.Civ.App.1999), the Court of Civil Appeals explained that, in practice, an independent agency might procure approval of specific insurance forms from the ADOI (and other states’ regulatory agencies) and then, once that approval is obtained, make those forms available for use by participating insurance companies. Of course, in this case Lincoln National is not using forms that some unrelated party had approved by the commissioner of the ADOI; it is using forms its predecessor in interest had had approved by the commissioner of the ADOI, and it has not even changed the titles of those forms from the titles they had when they were initially submitted to the ADOI for approval.[4] Under these circumstances, we cannot agree with the trial court in the Levins action that the forms GL-AMEND.ARBITR and AL ARB NOTICE-CERT were not approved by the ADOI and are accordingly void.
Smith and Levins also make the related argument that the arbitration provision in the group policy is void because, they allege, Lincoln National did not comply with the ADOI guidelines for arbitration agreements. As an exhibit to his first affidavit, Devitt attached a March 1998 bulletin issued by the ADOI outlining the ADOI guidelines for obtaining approval of arbitration provisions in insurance policies. Those guidelines state that, if an insurance policy is to contain an arbitration provision, then “at the time the application is taken the policy application or a separate *823 disclosure statement must contain an appropriate disclosure that the policy contains the arbitration requirement.” The guidelines further state that the policy application or separate disclosure form must be signed at the time of application. Smith and Levins argue that, because the application form for the group policy that Davis signed and completed on behalf of the Ninth Episcopal District did not contain an arbitration disclosure and because there was no separate disclosure form signed at the time of application (or otherwise), the arbitration provision in the group policy does not comply with ADOI guidelines and is accordingly void and unenforceable.
The defendants do not dispute the factual assertions made by Smith and Lev-ins regarding the lack of a signed disclosure form; however, they essentially argue that it is the ADOI guidelines cited by Smith and Levins that are void and unenforceable, not the arbitration provision in the group policy. We agree. In Advance Tank & Construction Co. v. Gulf Coast Asphalt Co., 968 So.2d 520, 528-29 (Ala. 2006), this Court rejected the argument that any special disclosure was required for arbitration provisions, explaining that arbitration provisions must be treated the same as other contractual provisions:
“[The appellee’s] argument would essentially require a special disclosure for an arbitration provision. ‘Courts may not, however, invalidate arbitration agreements under state laws applicable only to arbitration provisions.... Congress [has] precluded States from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed “upon the same footing as other contracts.” ’ Doctor’s Assocs., Inc. v. Casarotto, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996) (quoting Scherk v. Alberto-Culver Co., 417 U.S. 506, 511, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974)). Additionally, this Court has generally recognized that there is no duty to expressly disclose the existence of an arbitration provision. See Anderson v. Ashby, 873 So.2d 168, 183 (Ala.2003); Johnnie’s Homes, Inc. v. Holt, 790 So.2d 956, 960 (Ala.2001). Thus,, this argument is without merit.”
Any state requirement that an arbitration provision in an insurance contract be specially disclosed or executed separately from the main contract is unenforceable; federal law prohibits arbitration provisions from being singled out for such special treatment. Smith’s and Levins’s arguments that the arbitration provision in the group policy is void for failing to comply with the ADOI guidelines accordingly fails.[5]
IV.
Smith and Levins next argue that the arbitration provision in the group policy is unconscionable and therefore void. “Unconscionability is an affirmative defense, Green Tree Fin. Corp. v. Wampler, 749 So.2d 409, 415 (Ala.1999), and the party asserting the defense bears the burden of proof. Ex parte Napier, 723 So.2d 49, 52-53 (Ala.1998).” Fleetwood Enters., Inc. v. Bruno, 784 So.2d 277, 281 (Ala. 2000). In order to meet that burden, the party seeking to invalidate an arbitration *824 provision must establish both procedural and substantive unconscionability. Blue Cross Blue Shield of Alabama v. Rigas, 923 So.2d 1077, 1087 (Ala.2005). As this Court explained in Rigas:
“Substantive unconscionability
“ ‘ “relates to the substantive contract terms themselves and whether those terms are unreasonably favorable to the more powerful party, such as terms that impair the integrity of the bargaining process or otherwise contravene the public interest or public policy; terms (usually of an adhesion or boilerplate nature) that attempt to alter in an impermissible manner fundamental duties otherwise imposed by the law, fine-print terms or provisions that seek to negate the reasonable expectations of the nondrafting party, or unreasonably and unexpectedly harsh terms having to do with price or other central aspects of the transaction.” ’
“Ex parte Thicklin, 824 So.2d 723, 731 (Ala.2002) (emphasis omitted) (quoting Ex parte Foster, 758 So.2d 516, 520 n. 4 (Ala.1999), quoting in turn 8 Richard A. Lord, Williston on Contracts § 18:10 (4th ed.1998)). See also Leeman v. Cook’s Pest Control, Inc., 902 So.2d 641 (Ala.2004).
“Procedural unconscionability, on the other hand, ‘deals with “procedural deficiencies in the contract formation process, such as deception or a refusal to bargain over contract terms, today often analyzed in terms of whether the imposed-upon party had meaningful choice about whether and how to enter into the transaction.” ’ Thicklin, 824 So.2d at 731 (quoting Foster, 758 So.2d at 520 n. 4, quoting in turn 8 Williston on Contracts § 18:10).”
923 So.2d at 1086-87. In this case, Smith and Levins allege that the arbitration provision in the group policy is substantively unconscionable (1) because of the confidentiality clause it contains and (2) because it requires the policyholder and all insureds or beneficiaries to arbitrate their claims against Lincoln National but places no similar requirement upon Lincoln National to arbitrate its claims against those parties. Smith and Levins allege that the arbitration provision is procedurally unconscionable because, they allege, it was hidden from them and they were unfairly surprised by Lincoln National’s assertion of it after they initiated their actions.
We first consider Smith’s and Levins’s substantive-unconscionability arguments. The confidentiality clause in the arbitration provision in the group policy provides that “[arbitration under this provision is confidential. Neither a party nor an arbitrator may disclose the existence, content or results of any arbitration hereunder without the prior written consent of both parties.” Smith and Levins argue that this type of confidentiality clause usually favors companies over individuals, and they cite multiple cases from other jurisdictions in which courts have held similar clauses unconscionable. The primary case upon which they rely is Ting v. AT&T, 319 F.3d 1126 (9th Cir.2003), which provides the rationale for most of the other cases they cite. In Ting, the United States Court of Appeals for the Ninth Circuit affirmed a trial court’s holding that a confidentiality clause that similarly prevented the parties from disclosing “the existence, content or results of any arbitration” was unconscionable, stating:
“Although facially neutral, confidentiality provisions usually favor companies over individuals. In Cole [v. Burns International Security Services], 105 F.3d 1465 [ (D.C.Cir.1997) 3, the D.C. Circuit recognized that because companies continually arbitrate the same claims, the arbitration process tends to favor the company. Id. at 1476. Yet because of plaintiffs’ lawyers and arbitration ap *825 pointing agencies like the [American Arbitration Association], who can scrutinize arbitration awards and accumulate a body of knowledge on a particular company, the court discounted the likelihood of any harm occurring from the ‘repeat player’ effect. Id. at 1486. We conclude, however, that if the company succeeds in imposing a gag order, plaintiffs are unable to mitigate the advantages inherent in being a repeat player. This is particularly harmful here, because the contract at issue affects seven million Californians. Thus, AT & T has placed itself in a far superior legal posture by ensuring that none of its potential opponents have access to precedent while, at the same time, AT & T accumulates a wealth of knowledge on how to negotiate the terms of its own unilaterally crafted contract. Further, the unavailability of arbitral decisions may prevent potential plaintiffs from obtaining the information needed to build a case of intentional misconduct or unlawful discrimination against AT & T. For these reasons, we hold that the district court did not err in finding the secrecy provision unconscionable.”
319 F.3d at 1151-52.
The defendants, however, cite cases from the United States Courts of Appeals for the Fifth and Eleventh Circuits in which those courts have declined to hold that an arbitration provision is unconscionable on the basis of a confidentiality clause in the provision. See Caley v. Gulfstream Aerospace Corp., 428 F.3d 1359, 1378-79 (11th Cir.2005), and Iberia Credit Bureau, Inc. v. Cingular Wireless LLC, 379 F.3d 159, 175-76 (5th Cir.2004). In Iberia, the United States Court of Appeals for the Fifth Circuit rejected the plaintiffs’ Troy-based argument that a clause requiring the parties to keep the existence and result of any arbitration confidential rendered an arbitration provision unconscionable, stating:
“While the confidentiality requirement is probably more favorable to the cellular provider than to its customer, the plaintiffs have not persuaded us that the requirement is so offensive as to be invalid. Confidentiality can be desirable to customers in some circumstances. Cf. Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 170 F.3d 1, 8 n. 4 (1st Cir.1999) (observing, in an employment case, that both sides might prefer the confidentiality of arbitration); American Arbitration Association, Consumer Due Process Protocol, Principle 12(2) (April 17, 1998), at http://www.adr.org. Indeed, the plaintiffs’ attack on the confidentiality provision is, in part, an attack on the character of. arbitration itself. If every arbitration were required to produce a publicly available, ‘precedential’ decision on par with a judicial decision, one would expect that parties contemplating arbitration would demand discovery similar to that permitted under Rule' 26, [Fed.R.Civ.P.,] adherence to formal rules of evidence, more extensive appellate review, and so forth—in short, all of the procedural accoutrements that accompany a judicial proceeding. But part of the point of arbitration is that one ‘trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration.’ Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628, 105. S.Ct. 3346, 87 L.Ed.2d 444 (1985). We note as well that the creation of precedent—one of the plaintiffs’ main concerns—can cut both ways, since precedent can be helpful or harmful, depending on the decision.” .
379 F.3d at 175-76.
Upon considering the cases cited by both sides, we find the rationale of *826 Iberia more persuasive. Accordingly, we hold that, even if the confidentiality clause in the arbitration provision in the group policy may be more favorable to Lincoln National than to insureds or beneficiaries such as Smith and Levins, it is not so one-sided as to make the arbitration provision substantively unconscionable. We further note that, although the concerns raised by the Ninth Circuit in Ting regarding the use of confidentiality clauses in arbitration proceedings are legitimate, that same court subsequently recognized that those concerns are more pronounced in large class-action cases like Ting and less problematic in cases involving fewer plaintiffs. See Kilgore v. Keybank, N.A., 718 F.3d 1052, 1059 n. 9 (9th Cir.2013) (“Although we have found confidentiality provisions to be substantively unconscionable when applied to a large class of customers, [Ting ], the small number of putative class members in this case (approximately 120) mitigates such concerns.”). The instant cases do not involve a class at all; rather, they involve only two plaintiffs, and there is no suggestion that the number of individuals holding potential claims against the defendants could approach even the 120 in Kil-gore. We also recognize that, although Smith and Levins have expressed concern that the confidentiality clause in the arbitration provision in the group policy might hinder their ability to investigate their claims and to conduct discovery inasmuch as they are prevented from even disclosing to an outside party that they are engaged in arbitration proceedings against the defendants, “the enforceability of the confidentiality clause is a matter distinct from the enforceability of the arbitration clause in general.” Kilgore, 718 F.3d at 1059 n. 9. We are holding only that the arbitration provision is not substantively unconscionable on the basis of the confidentiality clause; we express no opinion regarding the enforceability of the confidentiality clause, and Smith and Levins “are free to argue during arbitration that the confidentiality clause is not enforceable.” Id.
Smith and Levins next argue that the arbitration provision in'the group policy is substantively unconscionable because it is asymmetrical; that is, although it purports to require them to arbitrate their claims against Lincoln National, it does not require Lincoln National to arbitrate any claims it might have against them or other beneficiaries. They again rely on a case applying California law in support of their argument, this time Armendariz v. Foundation Health Psychcare Services, Inc., 24 Cal.4th 83, 117-18, 99 Cal.Rptr.2d 745, 770, 6 P.3d 669, 692 (2000), in which the Supreme Court of California held an arbitoation provision to be unconscionable for this reason, stating:
“Given the disadvantages that may exist for plaintiffs arbitrating disputes, it is unfairly one-sided for an employer with superior bargaining power to impose arbitration on the employee as plaintiff but not to accept such limitations when it seeks to prosecute a claim against the employee, without at least some reasonable justification for such one-sidedness based on ‘business realities.’ As has been recognized ‘ “unconscionability turns not only on a ‘one-sided’ result, but also on an absence of ‘justification’ for it.” ’ (A & M Produce Co. [v. FMC Corp.], 135 Cal.App.3d [473,] 487[, 186 Cal.Rptr. 114, 122 (1982) ]). If the arbitration system established by the employer is indeed fair, then the employer as well as the employee should be willing to submit claims to arbitration. Without reasonable justification for this .lack of mutuality, arbitration appears less as a forum for neutral dispute resolution and more as a means of maximizing employer advantage. Arbitration was not intended for this purpose. (See Engalla [v. Permanente Med. Grp., Inc.], 15 Cal.4th [951,] 976[, 64 Cal. *827 Rptr.2d 843, 858, 938 P.2d 903, 918 (1997)]).
.“... Although parties are free to contract for asymmetrical remedies and arbitration clauses of varying scope, ... the doctrine of unconscionability limits the extent to which a stronger party may, through a contract of adhesion, impose the arbitration forum on the weaker party without accepting that forum for itself.”
However, as the Armendariz' court noted in the very next paragraph, this Court had previously considered this same issue and reached the opposite conclusion. Id. (“A contrary conclusion was reached by the Alabama Supreme Court in Ex parte McNaughton, (Ala.1998) 728 So.2d 592, 598-599.”). Ex parte McNaughton is still controlling caselaw in Alabama and has been cited by this Court in other cases when rejecting arguments like the one now made by Smith and Levins. For example, in Rigas this Court stated:
“Rigas also complains that the arbitration provision requires her claims to be resolved in arbitration but would allow Blue Cross to litigate any claims it may have against her in court. Her mutuality-of-remedy argument is simply erroneous. We have held:
“‘“The doctrine of mutuality of remedy is limited to the availability of the ultimate redress for a wrong suffered by a plaintiff, not the means by which the ultimate redress is sought. A plaintiff does not seek as his ultimate redress an arbitration proceeding or a court proceeding. Instead, he seeks legal relief (e.g., damages) or equitable relief (e.g., specific performance) for his injury, and he uses the proceeding as a means to obtain that result.” ’
“Green Tree Fin. Corp. of Alabama v. Vintson, 753 So.2d 497, 504 (Ala.1999) (quoting Ex parte McNaughton, 728 So.2d 592, 598 (Ala.1998)). Rigas’s argument is without merit.”
923 So.2d at 1091. Thus, the arbitration provision in the group policy is no.t substantively unconscionable on this basis either. Inasmuch as both of Smith’s and Levins’s substantive-unconscionability arguments are without merit, we may accordingly conclude that the arbitration provision is not unconscionable without examining Smith’s and Levins’s allegations of procedural unconscionability. The rulings of the trial courts denying the defendants’ motions to compel arbitration cannot be affirmed on the basis of unconscionability.
V.
We next consider the various arguments of Smith and Levins alleging that, even if the language of the arbitration provision might be enforceable in some circumstances, it does not apply to their specific disputes. They first argue that the defendants should not be allowed to enforce the arbitration provision against them because they did not sign an arbitration agreement or ever assent to arbitration.[6]
*828 It is undisputed that neither Smith nor Levins signed an arbitration agreement, and the general rule is that a party that has not signed an arbitration agreement cannot be forced to arbitrate claims. Edward D. Jones & Co. v. Ventura, 907 So.2d 1035, 1042 (Ala.2005). However, this general rule has its exceptions, and one of those exceptions is when the party that wishes to avoid arbitration has asserted claims that are dependent upon the existence of a contract that contains an arbitration provision. As this Court explained in Custom Performance, Inc. v. Dawson, 57 So.3d 90, 97-98 (Ala.2010):
“ ‘A plaintiff cannot simultaneously claim the benefits of a contract and repudiate its burdens and conditions.’ Southern Energy Homes, Inc. v. Ard, 772 So.2d 1131, 1134 (Ala.2000). Thus, this Court has developed a second exception to the general rule that a nonsig-natory cannot be forced to arbitrate. Regardless of whether a nonsignatory is in fact a third-party beneficiary, the nonsignatory is treated as a third-party beneficiary—and is equitably estopped from avoiding arbitration—when he or she asserts legal claims to enforce rights or obtain benefits that depend on the existence of the contract that contains the arbitration agreement. See, e.g., Capitol Chevrolet & Imports, Inc. v. Grantham, 784 So.2d 285, 289 (Ala.2000) (‘[T]o maintain her claims, [the nonsig-natory plaintiff] must be treated as a third-party beneficiary.... [A] third-party beneficiary is afforded all the rights and benefits, and has imposed upon him or her the burdens, of a contract, including those benefits and burdens associated with arbitration. Ex parte Stamey, 776 So.2d 85 (Ala.2000). Therefore, [the nonsignatory] cannot base her claims on the contract executed between her husband and Capitol Chevrolet, and at the same time seek to avoid the arbitration agreement. See Infmiti of Mobile, Inc. v. Office, 727 So.2d 42 (AIa.1999); Delta Constr. Corp. v. Gooden, 714 So.2d 975 (Ala.1998); and Ex parte Dyess, 709 So.2d 447 (Ala.1997).’); Infiniti of Mobile, Inc. v. Office, 727 So.2d 42, 48 (Ala.1999) (‘Under these circumstances, [the nonsignatory] is in the position of basing her fraud[-in-the-inducement] and breach-of-warranty claims on the contract ... while at the same time seeking ... to avoid the operation of [an arbitration] provision in that contract.... This she cannot do.’ (emphasis added)).”
In this case, the arbitration provision in the group policy by its terms applies to “[a]ny controversy, dispute or claim by any policyholder, insured or beneficiary ... arising out of or relating in any way to this policy and/or a certificate issued under this policy or the solicitation or sale thereof.” Smith and Levins claim to be beneficiaries of individual certificates issued pursuant to the group policy, and their right to assert the claims they have asserted is based on that beneficiary status. It is also clear that those asserted claims are directly dependent upon the group policy that contains the arbitration clause; for example, count five of both Smith’s and Levins’s complaints alleged that “Lincoln National breached its contract to provide coverage which Plaintiff was told [she or he] had purchased, and Plaintiff has been damaged as a proximate result.” Simply put, Smith and Levins *829 would have no claims against the defendants if not for the group policy and the certificates of insurance issued pursuant to it. See Ex parte Dyess, 709 So.2d 447, 451 (Ala.1997) (“[The nonsignatory’s] claims would not exist but for the contract between [the policyholder] and [the insurer].”). They cannot now seek the benefits of a contract—the life-insurance proceeds they allege have been wrongfully withheld—while repudiating a condition of the same contract that they find burdensome—the arbitration provision. Accordingly, notwithstanding the fact that they did not personally execute an arbitration agreement, Smith’s and Levins’s claims against the defendants are subject to the arbitration provision in the group policy.
VI.
Smith and Levins next argue that the defendants should not be allowed to enforce the arbitration provision in the group policy because, they allege, the defendants have not satisfied all the conditions precedent to arbitration set forth in the arbitration provision. See, e.g., Ex parte Williams, 591 So.2d 71, 73 (Ala.1991) (vacating order compelling arbitration, explaining that, “[p]ursuant to the provisions of the contract, failure to submit the dispute to the architect constituted a failure to meet the contractual condition precedent to arbitration”).
The first paragraph of the arbitration provision in the group policy provides:
“The following provisions will apply after the procedures for claim appeals, complaints or any other grievances have been exhausted. In the event of any dispute, claim question or disagreement arising out of or relating to this policy, the parties will use their best efforts to settle such disputes. To this effect, they shall negotiate with each other in good faith to reach a proper resolution.” Smith and Levins allege specifically that the Lincoln National claims-appeal process has not yet been finished and that they have yet to engage in any settlement negotiations; accordingly, they argue, the defendants’ request for arbitration was premature and was properly rejected by the trial courts on that basis.
The defendants, however, argue that Lincoln National’s claims-appeal process has been exhausted because Lincoln National rejected Smith’s appeal and Levins never initiated an appeal with Lincoln National. They further argue that there is no contractual requirement that they engage in settlement negotiations before initiating arbitration; the language of the arbitration provision regarding settlement and negotiation, they argue, does not create a condition precedent to arbitration but sets forth the duty of good faith that applies to all parties throughout the dispute-resolution process. Regardless, they further argue, it is the duty of the arbitration panel, not the trial court, to determine whether the conditions precedent to arbitration, if there are any, have been met.
In Brasfield & Gorrie, L.L.C. v. Soho Partners, L.L.C., 35 So.3d 601, 606 (Ala.2009), this Court cited the Supreme Court of the United States’ decision in Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002), when recognizing the general rule that the arbitrator, not the trial court, should decide whether all conditions precedent to arbitration have been met:
“[0]ur review of Howsam convinces us that [the parties’] contractual obligation to submit claims first to the architect for decision and then to mediate before invoking arbitration is the same kind of ‘condition precedent to an obligation to arbitrate’ that Howsam presumed would be decided by the arbitrator.”
*830 However, we also recognized an exception to this general rule “ ‘ “if ‘no rational mind’ could question that the parties intended for a procedural provision to preclude arbitration and that the breach of the procedural requirement was clear.” ’ ” Brasfield & Gorrie, 35 So.3d at 607 (quoting General Warehousemen & Helpers Local Union 767 v. Albertson’s Distribution, Inc., 331 F.3d 485, 488 (5th Cir.2003), quoting in turn Oil, Chem. & Atomic Workers’ Int’l Union Local 4-447 v. Chevron Chem. Co., 815 F.2d 338, 342 (5th Cir.1987)). This so-called “John Wiley ” exception has its origin in the Supreme Court of the United States’ decision of John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), and allows a trial court to decide whether the conditions precedent to arbitration have been met if the evidence in that regard is undisputed. See, e.g., In re Pisces Foods, L.L.C., 228 S.W.3d 349, 353-54 (Tex.App.2007) (affirming trial court’s refusal to compel arbitration where mediation was a condition precedent to arbitration and “[t]here is no allegation or proof that either party requested mediation, that they held a mediation, or that [the plaintiff] resisted participating in mediation”). However, this exception clearly does not apply in this case because there are disputes regarding the conditions precedent in the arbitration provision in the group policy: specifically, what exactly those conditions precedent are and whether they were satisfied with regard to either Smith or Levins. Those questions can be answered only by the arbitration panel, and the decisions of the trial courts to deny the defendants’ motions to compel arbitration cannot be affirmed on the basis of the defendants’ alleged failure to satisfy the conditions precedent in the arbitration provision.
VII.
The next argument as to why the arbitration provision in the group policy should not be enforced has been asserted only by Smith. She argues that the group policy contains a merger - clause providing that “[t]he entire contract between the parties” consists only of the policy, the policyholder’s application, and the insureds’ enrollment cards; thus, because the arbitration provision is found in an amendment to the group policy, she argues, it is not a valid part of the contract. See Ex parte Palm Harbor Homes, Inc., 798 So.2d 656, 660 (Ala.2001) (“Merger clauses ... create a presumption that the writing represents an integrated, that is, the final and complete, agreement of the parties.” (emphasis omitted)). Notably, Smith argues, this merger clause does not incorporate any endorsements or amendments to the group policy into the contract, thus distinguishing this case from cases like Philadelphia American Life Insurance Co. v. Bender, 893 So.2d 1104, 1108 (Ala.2004), in which this Coui't held that an arbitration provision contained in an endorsement to a life-insurance policy was enforceable where the merger clause in the policy expressly provided that “‘[t]he policy under which this Certificate is issued, including any endorsements, riders, attached papers, its application, and all enrollment applications constitute' the entire contract.” Because the arbitration provision in this case is contained in an amendment to the group policy, Smith argues that it is excluded by the merger clause and is not part of the contract between the parties; accordingly, she argues, the defendants cannot enforce it against her.
The defendants respond by arguing that Smith has ignored the full language of the merger clause, set out below, which, they argue, when considered in its entirety expressly contemplates amendments to the group policy:
*831 “ENTIRE CONTRACT. The entire contract between the parties consists of:
“(1) this policy and the group policyholder’s application (a copy is attached); and
“(2) the insured persons’ enrollment cards, if any.
“All statements made by the group policyholder and by insured persons are representations and not warranties. No statement made by an insured person will be used to contest the coverage provided by this policy; unless:
“(1) it is contained in a written statement signed by that insured person; and
“(2) a copy of the statement is furnished to the insured person or beneficiary.

“Only an officer of the company may change this policy or esetend the time for payment of any premium. No change mil be valid unless made in uniting and signed by an officer of the company. Any change so made will be binding on all persons referred to in this policy.”

(Emphasis added.) The defendants further argue that the amendment containing the arbitration provision was added to the policy in compliance with this provision inasmuch as it was made in a writing physically attached to and delivered with the group policy and was signed by a company officer. Accordingly, they argue, the merger clause does not exclude the arbitration provision and they may enforce it against Smith.
In support of their argument, the defendants cite Metropolitan Life Insurance Co. v. Glisson, 295 F.3d 1192, 1193-94 (11th Cir.2002), in which the United States Court of Appeals for the Eleventh Circuit, applying Alabama law, rejected the argument now being made by Smith, stating:
“Metropolitan Life Insurance Company (‘MetLife’) appeals the district court’s order denying its petition to compel arbitration and the court’s subsequent denial of its motion for reconsideration. The district court held that the arbitration endorsement attached to a life insurance policy MetLife sold to appellees Max Levon Glisson and Donna Glisson (together, the ‘Glissons’) was not a part of the policy, and was therefore unenforceable as to both appellees, because the endorsement was not incorporated by reference in the policy and was not specifically enumerated in the policy’s merger clause.
“The district court based its decision on its reading of Ex Parte Rager, 712 So.2d 333 (Ala.1998), in which the insured argued that he could not be bound by an arbitration agreement that was attached to his insurance policy because he had not separately signed the endorsement. In reaching its decision to compel arbitration, the Roger court relied on Greene v. Hanover Insurance Co., 700 So.2d 1354 (Ala.1997). A footnote in Greene states:
“ ‘As a general rule, where a rider or slip is physically attached to a policy of insurance contemporaneous with the execution, and delivered to the insured as attached, and sufficient reference is made in either the policy or the attached matter to identify the papers as related, the fact that the matter so attached is without the signature of the insurer ... will not preclude its inclusion and construction as part of the insurance contract.’
“700 So.2d at 1356 n. 3 (quoting 43 Am. Jur.2d Insurance § 296 (1982)) (emphasis added).
“The district court’s reliance on Rager and Greene was in error. Neither case held that an endorsement must be both attached to, and referenced within, an insurance policy to be valid. Rather, *832 Greene expressly states (and Roger adopts) that if the endorsement is attached, and sufficient reference is made in either the policy or the endorsement to identify the papers as related, the endorsement will be considered part of the policy. Section 27-14-1 of the Code of Alabama, which defines an insurance policy as including ‘all clauses, riders, endorsements and papers attached, or issued, and delivered for attachment thereto and made a part thereof,’ also supports this reading of Greene.
“Here, the endorsement was physically attached to the policy that defendants received. A ‘20-Day Right to Examine’ afforded defendants sufficient time to review the policy, including all attachments, and confirm that it conformed to their expectations. See Rager, 712 So.2d at 335 (relying on a 10-day right to examine). By not returning the policy to MetLife or otherwise objecting, defendants agreed to its terms. The fact that defendants never signed the endorsement does not preclude them from being bound by it. See id. at 335 (rejecting insured’s argument that unsigned endorsement was invalid).
“Greene also requires that sufficient reference be made in either the policy or the endorsement to identify the papers as related. See Greene, 700 So.2d at 1357 (citing 43 Am. Jr.2d Insurance § 296 (1982)). Though not specifically mentioned in the policy itself, the endorsement here specifically referenced the policy to which it was attached. It stated that any ‘claim or controversy relating in any way to the sale, servicing, validity ... of this 'policy ... must be submitted to final and binding arbitration.’ R2-27-Exl (Policy) (emphasis added). This language clearly indicates that the endorsement relates to the insurance policy to which it was physically attached and was intended to be included with it.
“The endorsement here also conformed exactly to the terms for modification set forth in the policy. Those terms require that any changes to the policy be issued in writing and signed by MetLife’s President, Vice-President, or Secretary in order to be valid. The endorsement here was attached to the policy, in writing, and signed by Christine N. Markussen, Vice-President-and Secretary of MetLife.
“For the foregoing reasons, we REVERSE the judgment of the district court and REMAND with instructions to grant MetLife’s petition to compel arbitration.”
(Capitalization in original.) Glisson is directly on point, and its interpretation of Alabama law is correct. The amendment containing the arbitration provision was physically attached to the group policy, and it made reference to the group policy both in its terms and by listing the policy number. Moreover, as in Glisson, the amendment “conformed exactly to the terms for modification set forth in the policy” inasmuch as it was in writing and was signed by a company officer. Id. at 1194. Smith’s argument that the merger clause in the group policy bars the amendment containing the arbitration provision from having effect is without merit.
VIII.
Finally, we consider Levins’s argument that the defendants have waived their right to enforce the arbitration provision in the group policy against him by substantially invoking the litigation process to his prejudice.[7] In Kennamer v. *833 Ford Motor Credit Co., 153 So.3d 752, 759 (Ala.2014), we explained how a party might waive its right to enforce a valid arbitration provision and how the party opposing arbitration can establish that waiver, stating:
“ ‘It is well settled under Alabama law that a party may waive its right to arbitrate a dispute if it substantially invokes the litigation process and thereby substantially prejudices the party opposing arbitration. Whether a party’s participation in an action amounts to an enforceable waiver of its right to arbitrate depends on whether the participation bespeaks an intention to abandon the right in favor of the judicial process, and, if so, whether the opposing party would be prejudiced by a subsequent order requiring it to submit to arbitration. No rigid rule exists for determining what constitutes a waiver of the right to arbitrate; the determination as to whether there has been a waiver must, instead, be based on the particular facts of each case.’
“Companion Life Ins. Co. v. Whitesell Mfg., Inc., 670 So.2d 897, 899 (Ala.1995).
‘“In order to demonstrate that the right to arbitrate a dispute has been waived, the party opposing arbitration must demonstrate both (1) that the party seeking arbitration substantially, invoked the litigation process, and (2) that the party opposing arbitration would be substantially prejudiced by an order requiring it to submit to arbitration.’ SouthTrust Bank v. Bowen, 959 So.2d 624, 633 (Ala.2006). Additionally, ‘[o]ur cases continue to make it clear that, because of the strong federal policy favoring arbitration, a waiver of the right to compel arbitration will not be lightly inferred, and, therefore, that one seeking to prove waiver has a heavy burden.’ Mutual Assurance, Inc. v. Wilson, 716 So.2d 1160, 1164 (Ala.1998).”
Lincoln National asserted that Levins’s claims were the subject of an arbitration agreement when it filed its July 11, 2014, answer to Levins’s first amended complaint—one week after that amended complaint was filed and approximately nine weeks after Levins’s original complaint was filed—but no party moved to compel arbitration until April 23, 2015, when the Ninth District filed a motion doing so, which motion Lincoln National joined six weeks later. Before the Ninth District moved to compel arbitration, Levins submitted discovery requests to the defendants, and Lincoln National and the Ninth District separately submitted discovery requests to him. Lincoln National also filed a motion to dismiss Levins’s claims, which was eventually heard by the trial court and granted in part and denied in part. Lev-ins argues that the defendants took advantage of the litigation process by conducting discovery and filing and waiting for the trial court to rule on a dispositive motion and that those actions, along with their delay in moving to compel arbitration until approximately 11 months after he initiated the action, indicates that they intended to abandon their right to enforce the arbitration provision against him and instead chose to resolve the dispute with him in the trial court. See, e.g., Morrison Rests., Inc. v. Homestead Vill. of Fairhope, Ltd., 710 So.2d 905, 907 (Ala.1998) (holding that party waived its right to enforce arbitration agreement where it waited to invoke agreement until eight months after lawsuit began and after an adverse judgment was entered against it on a summary-judgment motion). Moreover, Levins argues that he was substantially prejudiced by the time *834 and money he expended responding to the defendants’ litigation activities and that at least some of that time and expense would have been avoided had the defendants promptly moved to enforce the arbitration provision. In support of this argument, he submitted an affidavit from his counsel, detailing some of the time and expenditures related to his case. See, e.g., Aurora Healthcare, Inc. v. Ramsey, 83 So.3d 495, 501 (Ala.2011) (“Alabama caselaw shows that a party alleging prejudice is unlikely to prevail without presenting supporting evidence.”).
We first consider whether the defendants have, in fact, substantially invoked the litigation process. Levins argues that we should hold that there was a substantial invocation of the litigation process based on four factors: (1) the Ninth District did not raise arbitration as a defense in any of the three answers it filed; (2) the defendants initiated merits-based discovery; (3) the defendants waited to move for arbitration until 11 months after Levins had initiated the action, in spite of their knowledge of the existence of the arbitration provision; and (4) .Lincoln National filed a motion to dismiss, asking the trial court to enter a ruling on the merits before moving for arbitration. Initially, we note that this Court in Ex parte Merrill Lynch, Pierce, Fenner & Smith, Inc., 494 So.2d 1, 2-3 (Ala.1986), generally addressed each of those factors—the filing of an answer that did not assert arbitration as a defense, participation in the discovery process, the filing of a motion to dismiss, and a year-plus delay in moving for arbitration—and indicated that none of them, standing alone, was a sufficient basis on which to hold that the litigation process had been substantially invoked. However, we also noted in that ease that every case must be considered individually based on its “particular facts,” id. at 2, and in Hoover General Contractors—Homewood, Inc. v. Key, 201 So.3d 550, 553 (Ala.2016), we emphasized that the appropriate inquiry is “whether the party’s actions as a whole have substantially invoked the litigation process.” Accordingly, we must examine each of the factors identified by Levins and determine whether those factors collectively demonstrate that any of the defendants substantially invoked the litigation process.[8]
With regard to Levins’s argument that the Ninth District filed three answers without asserting arbitration as an affirmative defense, we note that in Key the plaintiff also pointed to the defendant’s failure to assert arbitration in its first three answers as evidence indicating that the defendant had elected to pursue litigation instead of arbitration. 201 So.3d at 552. However, we did not attach any significance in that case to the fact that three answers had been filed omitting any assertion of arbitration as opposed to just one; instead, we simply relied on the general rule that “the filing of an answer typically does not constitute a substantial invocation of the litigation process.” 201 So.3d at 554 (citing Ex parte Dyess, 709 So.2d at 453). That same conclusion is waxranted in this case; we do not afford much weight to the Ninth District’s answers omitting arbitration when determining whether it substantially invoked the litigation process. Of course, as regards Lincoln National, the fact that it asserted arbitration as an affir *835 mative defense in an answer filed only nine weeks after Levins initiated the action is a strong indicator that it was not choosing litigation over its right to enforce the arbitration provision.
Levins next cites the defendants’ active participation in the discovery process as evidence that they substantially invoked the litigation process. He notes that the Ninth District submitted requests for admission and interrogatories to him in September 2014 and that Lincoln National submitted requests for admission, - interrogatories, and requests for production to him in October 2014, and he emphasizes that that discovery was directed to the merits of his claims, not just the arbitrability of those claims. The defendants, however, allege that their discovery requests were limited, inasmuch as they sought only basic information that would have been asked for in arbitration as well, and they emphasize that no depositions were taken. Accordingly, they argue that their participation in discovery did not evince an intent to waive their right to arbitration.
As noted, supra, this Court indicated in Ex parte Merrill Lynch, Pierce, Fenner & Smith, 494 So.2d at 3, that a party’s mere participation in discovery is an insufficient basis upon which to conclude that that party has substantially invoked the litigation process. Among the cases relied upon in Ex parte Merrill Lynch, Pierce, Fenner & Smith was Ex parte Costa & Head (Atrium), Ltd., 486 So.2d 1272, 1277 (Ala. 1986) (overruled on other grounds in F.A. Dobbs & Sons, Inc. v. Northcutt, 819 So.2d 607, 611 (Ala.2001)), in which this Court stated:
“The joining of issue on the merits, assertion of a counterclaim or cross-claim, or engaging in discovery, alone, is not sufficient to create a waiver. Demsey & Associates, Inc. v. S.S. Sea Star, 461 F.2d 1009 (2d Cir.1972); Gavlik Construction Co. v. H.F. Campbell Co., [526 F.2d 777 (3d Cir.1975)]. As noted in Gavlik, ‘[rjecent cases have only found waiver where the demand for arbitration came long after the suit commenced and when both parties had engaged in extensive discovery.’ 526 F.2d at 783.”
(Emphasis added.) In this case, the Ninth District, and then Lincoln National, submitted to Levins one round of discovery requests seeking basic facts related to his claims. No depositions were requested or taken. This could hardly be considered “extensive” discovery manifesting an intent to abandon the right to proceed in arbitration. See also Ex parte Rager, 712 So.2d 333, 336 (Ala.1998) (declining to find waiver of the right to arbitration where party seeking to enforce arbitration agreement had conducted “very limited discovery” consisting of one set of interrogatories and two sets of requests for production).
Levins next argues that the defendants’ delay in moving for arbitration, in light of thbir long-held knowledge of the existence of the arbitration provision in the group policy, is a factor to consider when determining whether they substantially invoked the litigation process. However, although this Court often does discuss a party’s delay in moving for arbitration when considering whether the party has waived the right to arbitration, that discussion is more aptly suited for the second part of the arbitration-waiver test—whether the party opposing arbitration would be substantially prejudiced if forced to arbitrate claims after there has been some initial litigation involvement by the moving party. Put simply, delay matters primarily to the extent it is prejudicial. See, e.g., Crews v. National Boat Owners Ass’n Marine Ins. Agency, Inc., 46 So.3d 933, 941 (Ala.2010) (noting that party opposing arbitration “failed to carry his heavy burden of showing substantial prejudice by [the moving party’s] delay in asserting its right to com *836 pel arbitration”), and Ex parte Merrill Lynch, Pierce, Fenner & Smith, 494 So.2d at 3 (concluding that, even though the defendants waited over a year from the time the complaint was filed to move for arbitration, “[w]e cannot find that this delay caused plaintiff any prejudice”). See also Rush v. Oppenheimer & Co., 779 F.2d 885, 887 (2d Cir.1985) (“It is beyond question that defendants’ delay in seeking arbitration during approximately eight months of pretrial proceedings is insufficient by itself to constitute a waiver of the right to arbitrate, for in addition, prejudice to [the plaintiff] must be demonstrated”). Thus, the defendants’ delay in moving for arbitration is of only minimal, if any, relevance to our consideration of the first prong of the arbitration-waiver test—whether the defendants have substantially invoked the litigation process.
Finally, we consider Levins’s last argument, that Lincoln National substantially invoked the litigation process by moving the trial court to dismiss his claims against it. In support of this argument, Levins cites In re Mirant Corp., 613 F.3d 584, 589 (5th Cir.2010) (“ A party waives arbitration by seeking a decision on the merits before attempting to arbitrate.’ ” (quoting Petroleum Pipe Americas Corp. v. Jindal Saw, Ltd., 575 F.3d 476, 480 (5th Cir. 2009))), and Hooper v. Advance America, Cash Advance Centers of Missouri, Inc., 589 F.3d 917, 921 (8th Cir.2009) (“[The defendant’s] motion to dismiss was extensive and exhaustive, and substantially invoked the litigation machinery. [The defendant] drew the district court’s attention to multiple matters of first impression, asserted Plaintiffs failed to state claims upon which relief could be granted, and encouraged the district court to resolve the parties’ entire dispute in [the defendant’s] favor.”). Levins acknowledges that the filing of a motion to dismiss may not constitute a per se substantial invocation of the litigation process in Alabama; however, he argues that Lincoln National’s motion to dismiss placed the entire case in the hands of the trial court and that it would be unfair to allow Lincoln National thereafter to move for arbitration after that motion to dismiss was denied in part. Moreover, he argues that, although the Ninth District did not file the motion to dismiss, it previously admitted that it waited for the motion to be ruled upon before moving for arbitration, and, Levins argues, such gamesmanship should not be permitted.
Levins is correct in noting that in Alabama a party does not automatically waive its right to enforce an arbitration agreement by filing a motion to dismiss or other dispositive motion. Beyond just general statements to that effect in cases such as Ex parte Merrill Lynch, Pierce, Fenner & Smith, 494 So.2d at 3, we more recently considered this issue in O’Neal v. Bama Exterminating Co., 147 So.3d 403, 409-10 (Ala.2013), and held that a party did not waive its right to enforce an arbitration agreement by moving the trial court to enter a judgment on the pleadings limiting its liability. In doing so, we emphasized that the motion did not require the opposing party to conduct any discovery to oppose the motion and, importantly, that it came after the moving party had already raised arbitration as an affirmative defense. Id. In Zedot Construction, Inc. v. Red Sullivan’s Conditioned Air Services, Inc., 947 So.2d 396, 399 (Ala.2006), we held that a party’s motion to dismiss, treated as a motion for a summary judgment because it was accompanied by material outside the pleadings, did not constitute a waiver of the right to arbitration, again noting that the motion did not require the opposing party to conduct any discovery to oppose the motion and that the motion came after the moving party had already raised arbitration as an affirmative defense. We further noted in Ze-dot that, even though the trial court denied *837 the defendant’s summary-judgment motion, the defendant had not had a judgment entered against it, thus distinguishing an adverse ruling from an adverse judgment and Zedot from Morrison Restaurants. Like the moving parties in O’Neal and Zedot, Lincoln National had raised arbitration as an affirmative defense before moving to dismiss Levins’s claims, and its arguments in that motion did not require Levins to conduct discovery to counter them.
Although In re Mirant Corp. and Hooper—the cases cited by Levins—are on point and support his argument that Lincoln National substantially invoked the litigation process, those cases are from other jurisdictions and did not involve Alabama law. O’Neal and Zedot, however, are decisions of this Court and support Lincoln National’s position that it did not substantially invoke the litigation process merely by moving to dismiss Levins’s claims. We have stated that finding a waiver of the right to arbitration is disfavored and that any doubts concerning an allegation of waiver must be resolved in favor of arbitration. Creivs, 46 So.3d at 941. Considering all the facts surrounding Lincoln National’s motion to dismiss, alone and in conjunction with all the other actions of the defendants Levins alleges establish waiver, we cannot conclude “with positive assurance” that they support a finding of waiver. The Dunes of GP, L.L.C. v. Bradford, 966 So.2d 924, 927 (Ala.2007). Inasmuch as we are concluding that Levins did not meet his burden of establishing that the defendants substantially invoked the litigation process, it is unnecessary to consider the second prong of the arbitration-waiver test—whether he would be substantially prejudiced if forced to proceed on his claims in arbitration.
IX.
Smith and Levins sued the defendants asserting various claims after Lincoln National denied their claims for insurance benefits based on certificates of life insurance issued pursuant to a group life-insurance policy the Ninth Episcopal District had purchased from Lincoln National. The defendants subsequently moved the trial courts hearing the actions to compel arbitration of Smith’s and Levins’s claims pursuant to arbitration provisions in the group policy and individual certificates of insurance; however, the trial courts denied those motions. The defendants appealed to this Court, and we now reverse the decisions of the trial courts and remand the causes for the trial courts to enter new orders granting the motions to compel arbitration.
1141100—REVERSED MANDED. AND RE-
1141101—REVERSED MANDED. AND RE-
1150066—REVERSED MANDED. AND RE-
1150156—REVERSED MANDED. AND RE-
BOLIN, SHAW, and WISE, JJ., concur.
PARKER, J., concurs in the result.

. As explained by Levins in his first amended complaint, the AME Church’s Ninth Episcopal District is an unincorporated subdivision of the AME Church that oversees the operations of approximately 275 AME congregations in Alabama. Throughout the record and in their briefs to this Court, the parties generally, but not always, collectively refer to the AME Church and Davis simply as "the Ninth District.” For simplicity, we do the same unless otherwise noted.

. At the time of this conference in 2012, the life-insurance program was operated under a group life-insurance policy issued by Unum Life Insurance Company of America. However, on February 1, 2013, that policy was replaced with the group policy issued by Lincoln National.

. This was, in fact, the reason given by the Jefferson Circuit Court for denying the motions to compel arbitration in the Levins action. The Montgomery Circuit Court did not cite a reason for denying the motions to compel arbitration in the Smith action.

. The "GL" in "GL-AMEND.ARBITR” presumably stands for Guarantee Life.

. We note that this Court has released a multitude of opinions concerning arbitration law in Alabama in the years since the ADOI issued the March 1998 bulletin that Smith and Lev-ins rely on in this case. See, e.g., Thomas J. Methvin, Alabama—The Arbitration State, 62 Ala. Law. 48, 49-54 (Jan.2001) (noting that this Court decided 67 cases concerning the enforceability of arbitration agreements between January 1999 and September 2000 alone). The extent to which the ADOI has modified its guidelines in light of those decisions is not clear from the record in this case; we have before us only the March 1998 bulletin cited by Smith and Levins.

. In the context of this argument, Smith and Levins also emphasize that no one from the Ninth Episcopal District ever signed an arbitration agreement. However, we have previously stated that assent may "be evidenced by means other than signature, and, thus, [a] contract of insurance and the arbitration provision contained in it can be enforceable by the parties in the absence of signatures, where the evidence establishes the existence of the agreement.” Southern United Fire Ins. Co. v. Howard, 775 So.2d 156, 162 (Ala.2000). In this case, the Ninth Episcopal District received the group policy—including the amendment containing the arbitration provision—and was subsequently sent a confirmation letter instructing it to review the policy and informing it that subsequent premium payments would be considered acceptance of the policy. The Ninth Episcopal District did in fact subsequently malte premium payments. See American Bankers Ins. Co. of Florida v. Tellis, 192 So.3d 386, 391 (Ala. *828 2015), and Howard, 775 So.2d at 162-63 (both noting that policyholders assented to terms of an insurance policy containing an arbitration provision by, among other things, paying premiums). Moreover, the Ninth District further explicitly manifested its assent to the arbitration provision when it moved the trial courts hearing Smith’s and Levins's actions to compel arbitration.

. In Smith’s case, a motion to compel arbitration was first filed seven weeks after she filed her complaint; the only other action taken by any of the parties in the interim was Lincoln National's filing of its answer in which it also *833 asserted that her claims were the subject of an arbitration agreement, Smith has not argued that the defendants have substantially invoked the arbitration process.

. As Kennamer makes clear, in a case where it is alleged that multiple parties have waived their right to enforce an arbitration agreement, we must consider each individual party's separate actions to determine whether that party has waived its right to arbitrate even though "enforcing arbitration of related claims as to one defendant but not another may lead to inconsistent results and a lack of judicial economy.” 153 So.3d at 763.